and the final argued matter for today, Reilly v. Commissioner of Social Security 21-8. Thank you. Okay. Please proceed. Good morning. May it please the court. My name is Taylor Schubauer and I represent the appellant, Pamela Reilly. This concerns the denial of Social Security disability benefits under Title II of the Social Security Act. Ms. Reilly respectfully requests that this court reverse the district judge decision affirming the ALJ's decision in bringing down the matter to the Social Security Administration for re-hearing. The ALJ decision should be reversed because the Residual Functional Capacity finding, or RFC finding, was unsupported by substantial evidence. The ALJ violated the well-accepted treatment position rule in assessing the April 2017 opinion of Dr. Jessica Aborczyk, with whom Ms. Reilly had been treating for about five years at the time the ALJ rendered her decision, and new and material evidence submitted to the Appeals Council warrants reversal for consideration. Turning to my first point, under the regulations applicable to this claim, a treating physician's opinion is entitled to controlling weight unless it's not supported by medical findings or inconsistent with other substantial evidence. If an ALJ gives less than controlling weight to a treating physician's opinion,  she gave only partial weight to Dr. Aborczyk's opinion, then the ALJ is required to consider several factors in assessing that opinion. Those factors have become known as the Burgess Factors in this circuit. The ALJ's analysis of the Burgess Factors were insufficient under the law. In regard to the first factor, the frequency, length, nature, and extent of the treatment relationship, there was no acknowledgement of a treatment relationship when the ALJ gave partial weight to Dr. Aborczyk's opinion. The ALJ did not consider, for example, that Dr. Aborczyk treated Ms. Riley for five years for a variety of impairments, that she was the only provider of record to treat Ms. Riley both before and after her March 2013 motor vehicle accident and her September 2013 cervical surgery. The Dr. Aborczyk prescribed Ms. Riley medication, referred her to specialists, reviewed imaging and lab work, sent her her imaging and lab work. The ALJ's only reference to a treating relationship is noted earlier in the decision, Ms. Riley's hearing testimony, that she was treating with Dr. Aborczyk for about five years. I don't understand that. I'm looking at the ALJ's opinion. There's multiple references throughout the opinion of what Dr. Aborczyk reported, like on pages and pages of going through and analyzing it, so I don't understand why you think that's not... The ALJ noted the length of the relationship and then went through all the details of that relationship. The ALJ recites five treatment records from Dr. Aborczyk in the decision, but does not come up with any sort of analysis as to how those treatment records did not support her opinion. Well, she says that two doctors came out to the opposite conclusion. She notes that the treating physician's opinion was not consistent with the objective evidence and specifically points to the conservative treatment, daily activities, so there are a lot of reasons given for why both other doctors as well as other things in the records, such as the conservative treatment and the daily activity. Right, yeah. And we are to the first point about the two other doctors. There was an independent medical examiner, Dr. Blue, the ALJ gave Dr. Blue's opinion very late, as well as an independent medical examiner, Dr. Polavaric. However, it's our contention that neither of those opinions were supportive for the IRC finding, and they don't refute Dr. Borges' findings. Dr. Blue gave an opinion that says, my limitation for colon walking, bending, kneeling, overhead reaching. From that opinion, the ALJ assessed an IRC finding that Ms. Riley could stand and walk two to three hours, but only for 30 minutes at one time, sit for six hours, then use a sit-stand option every 30 minutes, as well as occasional crouching, stooping, kneeling, and left upper turned over and reaching. Dr. Blue's opinion was extremely vague. If this is a case where, say, the ALJ has limited Ms. Riley to the full range of light work, certainly there's cases showing that a consultative examiner's opinion for mild limitations supports the full range of light. But clearly here, the ALJ did not believe Ms. Riley could perform the full range of light work. She found her more limited. And Dr. Dracy, in the district court decision, acknowledged this is a situation where it's a special situation where the IRC is in between ranges, in between light and between cemetery. These are highly specific findings that are not supported by Dr. Blue's vague opinion and also not supported by Dr. Colbert's view. How about Dr. Mills? The ALJ did not consider Dr. Mills' opinion, but Dr. Mills, I can tell you, he outlined and concluded that Ms. Riley could perform her work as a cafeteria manager, as well as Dr. Colbert. The ALJ's decision concluded the opposite, that Ms. Riley could not perform any pastoral work, including her work as a cafeteria manager. So in regard to the specific findings of the IRC, neither Dr. Mills' opinion nor Dr. Colbert's view. What about the fact that the treating physician, in the report of the reasons for the decision, essentially just mirrored back what your client said subjectively? There was nothing else referenced, really, other than what was reported. Well, Your Honor, in the narrative letter that Dr. Borchett filled out that same day, there's an assessment form and then there's a narrative letter that was completed April 6, 2017. Yes, the narrative letter does reference Ms. Riley's reports from that day. However, the specific limitations in the assessment form were not recorded by Ms. Riley and Dr. Borchett's records. For example, Dr. Borchett promised Riley could lift up to 5 pounds, could stand and walk less than 2 hours per day. I know, but it doesn't, what I'm saying to you, it doesn't indicate any tests that were the basis for that. It seems when, in the narrative part. I'm having trouble hearing you. I'm sorry. In the narrative part, there was no other reasons given for those assessments, for those check your boxes assessments, other than essentially mirroring, almost verbatim, what was reported to the doctor from your client. Well, Your Honor, I mean... In other words, it didn't say an MRI or something objective. Well, Your Honor, I mean, there are, though, years worth of treatment records from Dr. Borchett in the record as well. I mean, it's a little... They cite those records to show that she was feeling fine, she was reporting feeling well during a majority of the period. I saw a number of references to the fact that she was feeling better, stopping any pain medication. So those treatment records hardly indicate someone who was unable to work at all. Well, Your Honor, there definitely is fluctuation in symptomology here. So she certainly has good and bad days. In regards to the medication, she did testify. She tried to take stronger pain medications, and they were giving her nausea as well as intensifying her headaches. So, I mean, that was the reason she wasn't taking any stronger narcotic pain medication. But there definitely is a fluctuation in symptomology here. I mean, there are some days, I agree, that's where she's giving minimal complaints. There's not really any objective findings on examination, but there's certainly other days where she is. And Dr. Borchett is the only provider who's had this longitudinal treatment relationship with her who can say overall, in the totality of the evidence, shows that this is what Ms. Riley is capable of. No other provider, not Dr. Blue, not Dr. Mills, not Dr. Kulvercu, have that longitudinal familiarity with Ms. Riley's functioning during the entire period. And as I said, Dr. Borchett treated Ms. Riley before the motor v-flax, and so she was able to assess her prior to that and then got to see the change in her lung-to-motor v-flax happen, and then even further examined her and treated her after the cervical spine surgery until the judge rendered her decision. In any event, so the first factor, as I said, the frequency, length, age, and extent of the treatment relationship, I mean, merely acknowledging the treatment record certainly is not, wasn't sufficient. The ALJ didn't consider the factors that I just discussed. And the ALJ's analysis of the second and third factors were conclusory statements. Although the ALJ certainly recited evidence, there was really barely any analysis as to what that, what those records show. I'm almost out of time, but if I could make one more point. Of course. The ALJ references, as I said, five treatment records from Dr. Borchett. Only one of those records that she cited showed that Ms. Riley had no complaints and that the examination was pretty normal. The other four, Ms. Riley either was complaining of pain or other symptoms and positive clinical findings for both. So on balance, the records from Dr. Borchett that the ALJ did consider actually supports Dr. Borchett's opinion and not the other way around. Thank you.  We deserve some time for rebuttal, but we'll hear from the government. Yes. Good morning. May I please report? My name is Catherine Zerbo. I represent the appellee, the Acting Commissioner of Social Security. Your Honors, I'm going to start by addressing some of the points that the government made. I'm going to disagree respectfully with Riley's contention that the ALJ hasn't properly considered Dr. Borchett's opinion. As the Court noted, the ALJ went through extensively the treatment records from Dr. Borchett in this case. I believe there are about eight treatment records in the record, and the ALJ discussed almost all of them. As Your Honor noted, most of those records didn't even involve the impairments that are at issue here, in which Riley is claiming for causing her disabled impairments. And there were a number of sick visits, there were some physical, annual physicals, and some other things related to acute issues, but not the acute issues that she claims are the basis of her disability. Can I focus you? There's been a lot of conversation about the treating physician's records pre-hearing. One of the reasons that the ALJ sided for rejecting the treaters' conclusions was the lack of underlying objective support for them. We then had a functional capacity evaluation, and the functional capacity evaluation not only provided an opinion of another source, but was essentially adopted by the treating provider to support the limitations that the treating provider provided. A functional capacity evaluation, I think courts have recognized, encompassed a blend of subjective and objective measures, but it's a controlled situation. It's direct observation, and there are validity measures built into a lot of the tests in a functional capacity evaluation. Why isn't it error not to even deal with the treating provider's opinion, and I understand under the regs you're supposed to give a good explanation if you're rejecting the treating provider's opinion, post-functional capacity evaluation. I'm really directing my attention at the Appeals Council ruling now. Thank you, Your Honor. Sure. Well, the functional capacity evaluation, which was conducted after the ALJ's decision, as you noted, for the explicit purpose of supporting rival's claim for disorderly disability by a one-time examining physical therapist, is actually not entirely consistent with the RFC assessment and also is generally duplicative of evidence that was already in the record or of statements that were already in the record. Generally, but it documents a lifting restriction of five pounds occasionally, which is lower than what the ALJ found, and it documents the sit, stand, walk on an occasional basis of less than a third of the time. It imposes or identifies restrictions that would be incompatible with the residual functional capacity that formed the basis of the vocational expert's testimony and the ALJ's ultimate finding as to non-disability, doesn't it? Well, it actually confirmed that she was able to sit, stand, and walk for up to 30 minutes at a time, as the RFC assessment provided for. In terms of the longer period, in terms of how long she would be able to sit, stand, and walk for the day, you know, bringing her to occasional, that was really based, it sounded like, on her statement of how long she would sit, stand, or walk. Didn't the evaluator say she demonstrated an ability to sit for 35 minutes, and didn't the evaluator then describe the evaluator's own observations of her movements through the course of the evaluation? He did, and I agree that she demonstrated the ability to sit for 35 minutes at one time, which is consistent with the RFC assessment, you know, saying she could sit for 30 minutes at a time. And she did that repeatedly during the course of this functional capacity evaluation. So, it wasn't that she just sat for 30 minutes and, you know, that was it. She can't sit anymore for the rest of the time. I think the evaluation said she sat for 30 minutes. For the interview portion, she said she drove herself there for 20 minutes, and she sat for another 30 minutes filling out paperwork. I think it was up to three or four, you know, kind of 20 or 30 minute segments of sitting that was observed just at that evaluation, which certainly cuts against the idea that she could only sit for a maximum of a couple of hours. But the lifting of the 10 pounds, more than 10 pounds, that would have been, just to follow up on Judge Robinson's point, inconsistent with the RFC, correct? Yes, that's correct, Your Honor. So, why isn't that a problem? Dr. Horchick had previously defined during the well-being period that she could only lift up to 5 pounds. So, that opinion was for the ALJ already. There's also significant evidence throughout the record showing that she had normal motor strength. Well, that opinion was before the ALJ already, but the critique of the opinion was that it wasn't backed by objective evidence. And now we have a physical therapist under direct observation and controlled conditions buttressing that. At a minimum, isn't she entitled to an explanation? You're providing all sorts of perhaps cogent reconciliation of the FCE with the evidence, but we don't have any of that from the administration of the ALJ. We have one line from the Appeals Council saying it wouldn't make a difference. Well, and that's the standard. The Appeals Council has to determine if the evidence shows a reasonable probability that it would change the outcome of the decision. And so the Appeals Council was looking at this one-time functional capacity evaluation by someone who's not an acceptable medical source nor a treating source that was done for the purpose of refuting the ALJ's decision against this body of evidence of five or more years, showing that there was one time in the evidence when she was limited to lifting five pounds, and it was immediately after her spine surgery in 2013. Following that, there's no other indication that she was unable to lift, consistent with the limitations in light work. She was repeatedly noted to have functional strength, that her strength was within functional limitations. She did five out of five strength. Dr. Boone found that she had five out of five motor strength. There just wasn't any evidence during the relevant period that's showing that she had such significant lifting limitations. And so the Appeals Council, based on that body of evidence and this post-decision functional capacity evaluation, reasonably concluded that there just wasn't – the evidence didn't show a reasonable probability that it would change the outcome of the ALJ decision, given all that evidence suggesting that she, since that 2013 surgery, she didn't have that degree of limitation in lifting. So the reg that talks about evaluating treating providers' evidence that says we will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion, I take it what you're explaining is that once that opinion is rendered and you get to the Appeals Council, if there's new evidence, including from the treating provider, that regulation doesn't require good reasons in our notice of determination, that the conclusion can stand if it can be defended by counsel on appeal. The new evidence isn't from a treating provider. The new evidence is from a physical therapist. Which was adopted by the treating provider. I respectfully disagree that she adopted it. She noted that the functional capacity evaluation was consistent with less sedentary work. She didn't specifically adopt it. She didn't observe it. It wasn't part of her longitudinal treatment of Riley. That's why she's entitled to any deference, because of that longitudinal relationship and her own observations, as Riley stated repeatedly. This wasn't observed by Dr. Gorchuk. This wasn't her own findings. This wasn't even consistent with her findings. Her findings show someone who's coming in repeatedly saying, I'm doing okay. She's taking pain medication occasionally. She's not even taking over-the-counter medication. I think the question in part was, what other than the regulation that Judge Robinson cited, is the Appeals Council bound by? What's the standard? The Appeals Council has to look at that evidence that comes in and determine if there's a reasonable probability that it would change the outcome of the determination, the AOA's determination. This question has come up before. It's almost a prejudice standard. The Appeals Council isn't required to specifically consider the evidence and accept review of the claimant's request for review, unless that evidence is meeting certain thresholds showing that it's reasonably likely it's going to change the outcome. So the Appeals Council is taking essentially a first look and saying, we don't think it's reasonably likely this is going to change the outcome. What I'm trying to figure out, and this goes to sort of, I don't know whether it's practice or regs, the Appeals Council did admit that evidence into the record. So we have this evidence that's now part of the record, but we don't have any decider explaining the things that you're now explaining as to why they're discounting, for example, the lifting of the exertional limit documented in the functional capacity evaluation. Is that consistent with agency practice and the applicable regulations? It is consistent with the applicable regulations. So the Appeals Council doesn't explain why they think there's no reasonable probability that it would change the outcome, they just... That's correct. They never do that. They're not required. Have I answered your question? Yes, thank you. I think it looks like I'm just about out of time. Actually, you're out of time. Thank you very much. We'll hear from both. Thank you. Just a couple of points. Counsel to the Commissioner said that the lifting restriction in the functional capacity evaluation, specifically, I believe it was five pounds, was not determined by the executive findings after surgery. There was no possible weakness or reduced strength. That is refuted by multiple clinical objective findings after June 2014, page 504 of the record, April 2017, page 621, March of 2016, page 658. So to say that there was no weakness... Can you read one of those to me? Just pick one of those and read it to me. What you're saying says that she couldn't lift more than 10 pounds. Well, no, Your Honor. Your Honor, what I'm saying is that the Counsel to the Commissioner said that there was no evidence of weakness on clinical findings after the September 2013 surgery, and I'm saying there are clinical findings of upper extremity weakness after the surgery. But is there any finding other than she said there was one time immediately after the surgery, there was one time immediately after the surgery where she conceded it said that she couldn't lift as much. But can you point to anything else on not just general weakness, but lifting, inability to lift? Is there anything else in the record? Well, I can just pull up the objective findings. I believe what the Counsel to the Commissioner was referring to was the discharge instructions when she had her surgery. The hospital said to lift over 10 pounds. I believe it was. By way of opinion, though, the only opinions are the ones in the record that were discussed by Dr. Mills. And then for other objective findings, in addition to the left shoulder weakness after surgery,  there's left shoulder impingement syndrome. There's reciprocal spinal remotion. So those are also clinical findings by way of another opinion or some other person actually opining that, other than Dr. Gorgic saying she's limited to five pounds. Do you agree, just to follow up on the colleague we had at the end with the government, that – can you hear me? Yes. I can do agree that all that the Appeals Council needs to do in connection with evidence that is introduced, that was not introduced for the ALJ, is to determine whether there's a reasonable likelihood that it would have produced a different result. Well, the Appeals Council has to determine if the material is new material, and within the materiality they have to determine if there would be a reasonable probability. Most Appeals Council orders will say, as it says here, that the evidence does not show a reasonable probability it would have changed the outcome. Right. However, within every single Appeals Council agreement order, it does say we apply the law of regulations that are in place at the time of this – Of course, but do they need to say more than what they said? I believe so. I mean – What makes you say that? Well – Is there a regulation? Is there a – beyond practice? I will say this. The whole reason that ALJs are supposed to use good reasons for discounting a treating physician's opinion is so the claimant can understand why their treating physician's opinion, which supports their claim, is not being given the way that they believe it deserves. So – But we're talking about the Appeals Council. Right. So I believe if the Appeals Council states that it's following the regulations, the rulings at the time – that were in place at the time of a decision, then they also need to give that sort of explanation to the claimant as well. So that would be my response to that. And I do have a little bit more time. I just want to say, adding on to that – No, you're going the opposite direction. Oh, I'm sorry. Yes. All right. Well, that's fine. But you can – I'll give you 10 – 20 seconds to finish up. Okay. Well, I just want to go one more last point. The RFC finding here was a critical issue, the exertional ability, because Ms. Riley did turn age 50 nine months after the alleged onset date. Had she been limited to sedentary – and remember, the ALJ limited her to a range between light and sedentary – had she been limited to sedentary, she wouldn't have been approved as of her 50th birthday, based on her age, her education, her work experience, and the needs that she had of transferable skills. And am I right that the five-pound lifting restriction is the difference between sedentary and this in-between place? Well, five pounds actually takes it below sedentary. That actually is demonstrating that sedentary you're technically able to lift up to 10 pounds. So that's even more limited than the full range sedentary. Thank you. Thank you both. We'll reserve the decision, and court is adjourned. Thank you. Thank you.